# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:09-CR-21-TS |
| | ) | |
| WILLIE MCBRIDE a/k/a | ) | |
| Willie Reo Davis | ) | |

## OPINION AND ORDER

More than twenty minutes into a traffic stop, the Defendant, Willie Reo Davis, consented to a search of his vehicle. The Defendant now seeks to suppress the drugs and firearms recovered as a result of that search, as well as the comments he made to the officer in connection with the discovery of the contraband. For the reasons stated in this Opinion and Order, the Defendant's Motion to Suppress [DE 24] is denied.

## BACKGROUND

On February 25, 2009, the Government charged the Defendant in a two-count Indictment with possessing with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1), and with possessing a firearm in furtherance of the drug trafficking offense, or carrying it during and in relation to that offense, in violation of 18 U.S.C. § 924(c). The charges stemmed from a February 2 traffic stop conducted on a vehicle that the Defendant was driving.

On July 23, the Defendant moved to "suppress as evidence items illegally seized from" his person "prior to, at the time of, or subsequent to his arrest." (Mot. to Suppress 1, DE 24.) The Defendant argued that the officer who stopped his vehicle for having no license plate and speeding violated the Defendant's Fourth Amendment rights when he engaged in conduct that exceeded the scope of the stop for the driving infractions. The Defendant maintained that the

despite the officer having all the information necessary to "conduct business," and lacking any particular facts from which to reasonably infer that the Defendant was armed and dangerous or could gain immediate control of weapons, the officer required the Defendant to exit his car to engage him in further conversation and to ask if he could conduct a pat down search. (*Id.* at 1–2.) He argued that the officer also made other inquiries that were not reasonably related in scope to the traffic stop.

On August 24, the Government filed its Response in Opposition to Defendant's Motion to Suppress [DE 28]. After supplementing the facts set forth in the Defendant's Motion, including that the Defendant consented to both the pat down and the search of his car, the Government submitted that the Defendant did not establish that he was entitled to a hearing on the issues raised in his Motion to Suppress because the complained-of actions of the officer were reasonable under established Fourth Amendment jurisprudence.

On September 25, the Defendant filed a Memorandum in Support of Motion to Suppress [DE 30]. The Defendant framed the "single issue" that his Motion to Suppress presented as follows: "Did the officer unreasonably prolong a traffic stop, thereby violating the Fourth Amendment rights of the driver, when he continued his questioning beyond the reasonable time necessary to conduct his investigation?" (Def.'s Mem. 1.) The Defendant concluded that "extensive questioning" "measurably prolonged the stop beyond the time it was necessary to issue the citation," including the request that the Defendant consent to a search of his vehicle. (*Id.* 6, 8.) He also contended that the fruits of the search should, as a consequence, be suppressed. The Defendant indicated that it would be appropriate for the Court to view the recording of the officer's in-car video, which captured the events of the traffic stop, and asked

the Government to submit it to the Court.

On October 13, the Court held a telephone status conference with counsel to inquire into the necessity of an evidentiary hearing. The Court granted the Defendant's request for a hearing over the objection of the Government.

On November 4, the Court held an evidentiary hearing. The Defendant was present in the courtroom with his attorney, Michelle Kraus. The Government was represented by AUSA Tina Nommay. The Court heard testimony from Allen County Sheriff Department Officer James Gasvoda, the officer who conducted the February 2 traffic stop invovling the Defendant. The in-car recording of the traffic stop was admitted as an exhibit.

## STATEMENT OF FACTS

Having considered the testimony of Officer Gasvoda and the video recording of the traffic stop, the Court finds the following facts to be pertinent and true.

On February 2, 2009, Officer Gasvoda decided to stop the driver of a 1999 Chevy Monte Carlo after his radar recorded the car going 74 miles per hour in a 60 miles per hour speed zone, and he observed that the car did not have a rear license plate. As he drove to catch up to the Monte Carlo, Officer Gasvoda also witnessed the driver cut in and out of traffic to speed around slower traffic, follow other cars too closely, and change lanes without signaling. As Officer Gasvoda's vehicle approached the Monte Carlo, he activated his lights and sirens, and the driver responded by pulling over, first to the left travel lane and then to the right shoulder. As the car came to a complete stop, Officer Gasvoda saw the Defendant reaching over and moving around in the passenger area, where a second occupant was sitting.

Due to poor weather and busy traffic, Officer Gasvoda approached the passenger side of the vehicle. The passenger rolled down his window, and Officer Gasvoda asked the Defendant for his driver's license, registration, and proof of insurance. When Officer Gasvoda pointed out that there was no license plate on the car, the Defendant explained that he had just purchased the car and was only given a temporary sticker. Gasvoda asked the Defendant if he had any paperwork showing that he bought the car.[1] While the Defendant looked for paperwork, Officer Gasvoda asked the passenger for his name and whether he had any identification. Because the passenger did not have any identification, Officer Gasvoda had to write his information down on paper. The Defendant produced an Illinois identification card and insurance card, but said that he could not find the paperwork for the car.

After Officer Gasvoda had obtained information regarding both parties, he asked the Defendant to exit his vehicle and come back to the right front corner of the officer's car. He did this so they could talk without leaning over the passenger. He also wanted to run a "vin check" and a "federal sticker inspection," as he routinely did in traffic stops, without having to pass in front of the running vehicle with a person still in the driver's seat and to avoid being accidentally pushed out into traffic with the open car door. (Supp. Hr'g Tr. 11.)

Once the driver exited the car, Officer Gasvoda asked if he could pat him down because he did not know the Defendant and wanted to make sure that he did not have any weapons. The driver agreed, and Officer Gasvoda conducted a pat down without incident.

As Officer Gasvoda informed the Defendant why he pulled him over and listened to the Defendant's explanation, Officer Heck appeared on the scene in his own car. Officer Heck and

---

[1] At this time, Office Gasvoda could not see the temporary tag laying in the back window, and the tag is not visible when viewing the in-car video.

Officer Gasvoda generally worked as partners in the same area so they could back each other up. Officer Gasvoda gave Officer Heck the signal to bring his K-9 to do a "free air sniff" of the vehicle. (Supp. Hr'g Tr. 14.) The Defendant was alarmed by the dog initially and started backing away from it with his hands in the air. Officer Gasvoda told the Defendant to relax and to come back because he did not want him to get hit by a car. (The Defendant was backing toward the roadway.) Officer Gasvoda assured the Defendant that the dog would not hurt him. The dog circled the vehicle with no obvious alerts.

As the dog was circling the vehicle, Officer Gasvoda continued to inquire about the Defendant's driving status and learned from the Defendant that his license was expired. He then engaged the Defendant in conversation about where he was coming from, how long he had been there, where he was going, and who his passenger was. The driver responded that they were coming from Fort Wayne and going back to Chicago. He said he had been with his friend in Fort Wayne for about three weeks visiting family, and indicated that he had some luggage with him. This line of questioning lasted for less than one minute.

Officer Gasvoda then approached the passenger to tell him the driving violations he had observed and to explain that he was going to be checking the vehicle identification number and federal sticker. Officer Gasvoda also asked the passenger similar questions to those he had asked the Defendant. In response, the passenger indicated that they had been in town visiting his sister and had been there for two days or less. The passenger, when asked, said that he did not have any luggage.

After one minute of questioning, Officer Gasvoda checked the vehicle identification number and returned to his car to start running the information to write tickets. Before he got in

5

his car, he again asked the Defendant how long he had been in Fort Wayne and who he had been visiting, because the Defendant's original answers had not aligned with the passenger's response. This time, the Defendant said that they had been in Fort Wayne for two weeks, and that they were seeing the passenger's mother. Because the Defendant was cold, Officer Gasvoda offered to retrieve the Defendant's coat from his car, but first made sure the Defendant consented to Officer Gasvoda checking the pockets of the coat he was about to hand him.

Officer Gasvoda then told the Defendant to wait outside while he verified the Defendant's license and wrote tickets. Officer Gasvoda talked with dispatch, ran information, and searched for warrants. Officer Gasvoda expressed to dispatch that he was not sure he had the proper identifying information because the passenger had no identification and the Defendant had only an Illinois identification card. He also noted their inconsistent stories and appearance of nervousness. Officer Gasvoda eventually learned that the Defendant and the passenger did not have any outstanding warrants, and that the temporary sticker had been verified as valid by Fort Wayne police during a traffic stop conducted on January 30. Officer Gasvoda wrote one citation for speeding and decided to give the Defendant warnings for the remainder of the infractions. Officer Gasvoda was in his squad car for nearly ten minutes while the Defendant waited outside with Officer Heck.

Officer Gasvoda got out of his car to explain the ticket to the Defendant and field a couple of his questions about the ticket, but he believed there was something else going on. He testified that he "decided to lighten things up and tried to make funny jokes" by asking the Defendant if he had any dead bodies or anything in his car. (Supp. Hr'g Tr. 15.) The Defendant said he did not, and Officer Gasvoda asked for permission to search the car. The Defendant

6

agreed to the search. Officer Heck stood with the driver while Officer Gasvoda had the passenger exit the vehicle, conducted a pat down, and directed him to go back to Officer Heck. Officer Gasvoda found what he believed to be marijuana and crack cocaine hidden inside a can that was located in the glove compartment. He then took both the driver and the passenger into custody and advised the Defendant of his rights under *Miranda*. The Defendant waived his rights and made statements about his drug dealing and about drugs and a gun that were in the car. Upon making these statements, Officer Gasvoda recovered more drugs from the car and a firearm hidden under the seat. The Defendant admitted that these items belonged to him.

## DISCUSSION

The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When police officers stop an automobile and detain the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *Whren v. United States,* 517 U.S. 806, 809–10 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (stating that the Fourth Amendment's protection against "unreasonable searches and seizures" extends to "brief investigatory stops of persons or vehicles"). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Any ulterior motive an officer may have for making the stop is irrelevant. *United States v. Bass*, 325 F.3d 847, 850 (7th Cir. 2003) (citing *Whren*, 517 U.S. at 813). An officer may order a vehicle's occupants out of the car during a routine traffic stop. *See Maryland v. Wilson*, 519 U.S. 408, 410 (1997); *United States v. Muriel*,

7

418 F.3d 720, 726 (7th Cir. 2005).

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). The length of detention following a traffic stop based upon probable cause must be reasonable. *Id.*; *Muriel*, 418 F.3d at 725; *United States v. Childs,* 277 F.3d 947, 954 (7th Cir. 2002) (en banc) ("What the Constitution requires is that the entire process remain reasonable."). As the Supreme Court recently explained:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

*Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009) (citations omitted); *see also Muriel*, 418 F.3d at 725 (holding that while "questions that prolong custody may affect the reasonableness of the detention," "[o]fficers need not have reasonable suspicion to ask questions unrelated to the purpose of the traffic stop"). "The Fourth Amendment's reasonableness requirement strikes a balance between an individual's interest in being left alone and the public's interest in community safety, crime control, and the safety of law enforcement officers engaged in the work of protecting the public and investigating crime." *United States v. Jennings*, 544 F.3d 815, 819 (7th Cir. 2008).

In framing the issue, the Defendant does not dispute that Officer Gasvoda had probable cause to stop the vehicle that the Defendant was driving when he committed several traffic infractions in Officer Gasvoda's presence. Likewise, there does not appear to be any dispute that

8

the Defendant was not free to leave and was thus seized during the duration of the stop. The patdown, both of the Defendant's outer clothing and later of the jacket retrieved from his car, was conducted with the Defendant's consent, did not yield any of the evidence at issue, and did not unnecessarily prolong the detention. The Defendant also gave Officer Gasvoda consent to search his car, and consent renders a search reasonable under the Fourth Amendment unless given involuntarily, which the Defendant does not allege. *See Muriel*, 418 F.3d at 725 (7th Cir. 2005) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). However, the Defendant maintains that his consent came only after he had been detained for a longer period of time than was necessary to investigate and write tickets for the driving violations. The pertinent inquiry, therefore, is whether the duration and scope of Officer Gasvoda's seizure of the Defendant exceeded constitutional limits. The appropriate focus is the time that elapsed between the initial stop and the Defendant's consent to search. *Muriel*, 418 F.3d at 725. In making this determination, the Court is aided by the in-car video recording and Officer Gasvoda's testimony.

The length of the traffic stop was the result of several factors. The Defendant did not have a valid license plate affixed to his car, and Officer Gasvoda was entitled to question the Defendant about this apparent violation. The Defendant provided an explanation, but could not produce paperwork to establish that he recently purchased the car. When asked for identifying information, the Defendant presented an Illinois identification card, but not a driver's license. This also required additional inquiry and explanation to determine whether the Defendant was a licensed driver. The passenger of the car did not have any form of identification, and Officer Gasvoda had to manually write down the information that was verbally provided to him, including name, date of birth, address, and social security number. These inquires were

9

reasonable and appropriate. *See Muriel*, 418 F.3d at 726 ("[A]s part of [a valid traffic] stop, police may ask the vehicle's occupants 'a moderate number of questions' and request their identification." (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)); *see also United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (stating that a trooper's additional questioning and investigation to determine whether a driver who failed to produce a valid driver's license was a licensed driver and to determine whether the car he was driving was rented were "routine and part of a reasonable law-enforcement inquiry under the circumstances" and "justified a lengthier stop").

A review of the stop reveals that, because Officer Gasvoda had to determine whether the Defendant was a licensed driver, confirm the Defendant's and the passenger's identities, and also verify whether the car was properly licensed, the majority of the traffic stop was spent collecting information and checking it as part of reasonable law enforcement duties. It took more than five minutes at the beginning of the stop to collect the initial information about the identities of the Defendant and his passenger, ask the Defendant about his driving status and the status of the car, and tell the Defendant why he was stopped.[2] Officer Gasvoda spent another two minutes later in the stop checking the identifying numbers on the car and retrieving a coat for the Defendant, which the Defendant requested because it was cold outside. Twelve minutes elapsed while Officer Gasvoda communicated with dispatch, checked for warrants, wrote a ticket, checked the vehicle identification number, federal sticker, and temporary plate tag, and explained the ticket

---

[2] The in-car video recording begins with Officer Gasvoda driving to catch up to the Monte Carlo. By the time Officer Gasvoda pulls the car over and approaches the passenger side of the car, the timer on the video indicates that it had already been recording for over two minutes. Thus, any of the Court's calculations related to the timing of events during the traffic stop account for this expiration of time.

to the Defendant. This activity was expected and reasonable as part of a traffic stop.³

When contrasted to the time spent conducting activities that were central to the purpose of the stop, the questioning about which the Defendant complains constituted a negligible length of time. It took less than one minute to ask the Defendant questions about where he was going and where he had come from. It took another minute to ask the passenger the same kind of questions. The Defendant's and the passenger's inconsistent answers to questions about how long they had been in Fort Wayne prompted Officer Gasvoda to ask the Defendant two follow up questions about how long they had been in Fort Wayne and who they had been visiting. The Defendant's response that he had been in Fort Wayne for two weeks was inconsistent with his original answer and with the passenger's response. He also identified a different person as the one they had been visiting.

Officer Gasvoda prolonged the stop by roughly two minutes with his questions to the Defendant and his passenger. The Court finds that this brief pause in the traffic citation process did not "measurably extend the duration of the stop." *Johnson*, 129 S. Ct. at 783. The modest incremental delay to investigate possible drug trafficking or other illegal conduct was too small an inconvenience to make the lawful seizure unreasonably long. The Seventh Circuit provided

---

³ Because the passenger did not have any form of identification and the Defendant did not have a driver's license, Officer Gasvoda was not even sure if the names they provided to him were accurate, particularly in light of their apparent untruthfulness in telling him with whom they had been visiting and for how long. In fact, the names the Defendant and his passenger provided for themselves were false, although Officer Gasvoda did not learn this during the stop. Although the false names cannot be used as a factor arousing suspicion of criminal activity, they may have contributed to the length of time required to verify their information. In any event, it was not Officer Gasvoda's actions that caused the verifying process to be delayed, but the Defendant and his passenger's sparse identifying information. Moreover, Officer Gasvoda was all the more justified in requesting a broad warrants search given the lack of documentation and the inconsistent stories provided by the Defendant and his passenger regarding whom they had been visiting and for how long. *See United States v. Martin*, 422 F.3d 597, 602 (7th Cir. 2005) (stating that information obtained during the time necessary to issue a traffic ticket "may provide the officer with reasonable suspicion of criminal conduct that will justify prolonging the stop to permit a reasonable investigation").

the following reasoning in determining that an officer reasonably extended a traffic stop when he asked the driver of a car about marijuana and further inquired whether he would consent to a search of the car:

> [T]he fourth amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished. What the Constitution requires is that the entire process remain reasonable. Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public—for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

*Childs,* 277 F.3d at 953–54. The lawful ability of officers to ask questions without having reasonable suspicion extends to passengers. *Muriel*, 418 F.3d at 726 (citing *Childs*, 277 F.3d at 952 and *United States v. Moore*, 375 F.3d 580, 583 (7th Cir. 2004)).

As for the two questions Officer Gasvoda asked after giving the Defendant his ticket—whether he had any dead bodies in the car and whether he would consent to a search of the vehicle—they likewise did not turn the reasonable detention into an unreasonable one. *Cf. Childs*, 277 F.3d at 954 (asking a person stopped for a traffic offense whether he is committing any other crime is "not an unreasonable law-enforcement strategy" and does not turn the custody into an "unreasonable" seizure). Once the Defendant consented to the search, Officer Gasvoda did not need a warrant or probable cause to conduct it. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (stating that "one of the specifically established exceptions to the requirement of both a warrant and probable cause is a search conducted pursuant to consent").

The Defendant makes much of the use of the dog, mostly as evidence that he was being detained and was not free to leave. The video does in fact show the Defendant backing away

from something that is out of the camera's view with his hands in the air, and the officer telling him to come back and not to back into traffic. However, the fact that the Defendant was not free to leave is not a point of contention. When the dog performed the free air sniff around the car, the traffic violations were not yet resolved. In fact, Officer Gasvoda was still in the process of explaining why he had stopped the Defendant, and continued to do so as Officer Heck circled the car with the leashed dog. He had not yet verified any of the information provided by the Defendant, or determined the status of the unlicensed car or the Defendant's driving status. Thus, the Defendant would not have been free to leave regardless of the dog's presence. *See Arizona v. Johnson*, 129 S. Ct. at 784 ("For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers."). Simply using a drug-sniffing dog during an otherwise lawful traffic stop does not implicate a defendant's legitimate privacy interests. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). If the Defendant means to argue that the presence of the dog subjected him to restraints comparable to those associated with formal arrest, the Court does not find legal support for such a contention.[4]

Because Officer Gasvoda had to determine whether the Defendant was a licensed driver, confirm the Defendant's and his passenger's identities, and verify whether the car was registered and licensed, the majority of the traffic stop was spent collecting information and checking it. Roughly two minutes of the twenty-two minutes that elapsed before the Defendant consented to the search of the vehicle were spent in questioning that was unrelated to the scope of the stop. Officer Gasvoda then asked two questions after issuing the Defendant a speeding ticket that led

---

[4] Additionally, none of the evidence suggests that the dog was anywhere near the Defendant after it completed its sniff or fifteen minutes later when the Defendant gave Officer Gasvoda consent to search his car.

13

to consent to search the vehicle. This questioning held potential for detecting crime, yet created little or no inconvenience to the Defendant and the passenger, and did not measurably extend the duration of the stop. Considering the totality of the circumstances, the nature and duration of the stop remained reasonable throughout, and the Defendant's Fourth Amendment rights were not violated. Thus, there is no legal basis to suppress the evidence discovered from the search of the vehicle, or the statements he made during and following the search.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress [DE 24] is DENIED. The trial in this matter is now scheduled to begin on January 12, 2010, at 8:30 AM before Judge Theresa L. Springmann. A telephonic Final Pretrial Conference is scheduled for Monday, January 4, 2010, at 10:00 AM. The Court will initiate the call.

SO ORDERED on December 4, 2009.

                                           s/ Theresa L. Springmann
                                           THERESA L. SPRINGMANN
                                           UNITED STATES DISTRICT COURT